SARA R. VIUDA DE SALAZAR, recurrente, *v.* COMISIÓN INDUS-
TRIAL DE PUERTO RICO, ETC., demandada; ADMINISTRADOR
DEL FONDO DE SEGURO DEL ESTADO, interventor.

Número 450.
*Sometido:* 2 de marzo de 1953. *Resuelto:* 25 de febrero de 1954.

*Luis Blanco Lugo,* abogado de la recurrente; *Ángel de Jesús Matos* y *Donald R. Dexter,* abogados del interventor.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del tribunal.

Este caso trata de un médico cuyo trabajo le exigió estar durante 26 años expuesto a irradiaciones de Rayos X, con motivo de lo cual contrajo un cáncer que le ocasionó la muerte. El artículo 2 de la Ley de Compensaciones por Accidentes del Trabajo(¹) dispone que se compense a los empleados que "sufran *lesiones* o se inutilicen, o que pierdan la vida *por accidentes* que provengan de cualquier acto o función inherente a su trabajo o empleo y que ocurran en el curso de éste, y como consecuencia del mismo o por enfermedades o muerte derivadas de la ocupación, según se especifican en el artículo siguiente." (Bastardillas nuestras.) El cáncer no aparece incluído en la tabla o lista de enfermedades ocupacionales por las cuales se concede compensación a virtud del

---

(¹) La Ley núm. 45, Leyes de Puerto Rico, 1935 ((1) pág. 251), según fué enmendada por la Ley núm. 8, Leyes de Puerto Rico, 1948 ((1) pág. 17).

artículo 3 de la Ley. En su consecuencia, la compensación en este caso puede fundarse únicamente en la conclusión de que hubo una lesión por accidente.

Desde el año 1924 hasta su muerte en 1950 el Dr. Guillermo Salazar prestó servicios para el Departamento de Salud de Puerto Rico como radiólogo y tisiólogo. En el curso de su empleo tomaba radiografías y fluoroscopías a los pacientes pobres a fin de poder determinar si sufrían de tuberculosis. Realizó esta labor diariamente, con ligeras interrupciones, por espacio de veintiséis años y hasta dos semanas antes de su muerte a la edad de 69 años.

En 1945 se manifestó una lesión cutánea en el dedo anular de la mano izquierda del Dr. Salazar. El propio doctor se diagnosticó la lesión como de naturaleza tuberculosa y recibió en la misma tratamientos de Rayos X. En 1949 efectuó un viaje a España, donde un cirujano le amputó el dedo en cuestión bajo la teoría de que la lesión era tuberculosa.

En abril de 1949, cuando ingresó en el Hospital Presbiteriano, el Dr. Salazar todavía creía que la lesión en el dedo amputádole era de naturaleza tuberculosa. Durante su permanencia en el hospital desde el 4 hasta el 10 de abril de 1949, otros médicos rindieron por primera vez un diagnóstico definitivo al efecto de que el Dr. Salazar tenía un cáncer; se llegó entonces a la conclusión de que la lesión había sido cancerosa desde sus comienzos. En septiembre de 1949 se le amputó el brazo izquierdo al Dr. Salazar por habérsele extendido el cáncer epidermoide hasta el área escapular.

El 6 de octubre de 1949 el Dr. Salazar radicó una reclamación de compensación basada en incapacidad permanente. Mientras se tramitaba esta reclamación, el Dr. Salazar falleció el 11 de enero de 1950 de un cáncer metastático causado por un carcinoma epidermoide. Su beneficiaria radicó entonces una reclamación de compensación por la muerte del doctor. El Administrador del Fondo del Seguro del Estado declaró sin lugar esta reclamación, apelando la beneficiaria

para ante la Comisión Industrial. La Comisión resolvió que el caso envolvía "una típica enfermedad ocupacional y no un accidente del trabajo compensable." Toda vez que el cáncer no es una enfermedad ocupacional compensable bajo nuestra Ley, la Comisión desestimó la reclamación. Uno de los Comisionados disintió. Expedimos el auto al solicitarnos la beneficiaria que revisáramos la decisión de la Comisión.

La Comisión resolvió que la lesión que primeramente se manifestó en 1945 fué causada por la "continua y diaria exposición a las emanaciones de los Rayos X . . ." mientras tomaba radiografías y fluoroscopías a sus pacientes en el curso de su empleo. En los autos existe amplia evidencia para sostener esta conclusión de la Comisión y el Administrador del Fondo del Seguro del Estado no la impugna. El testimonio médico demuestra que esta lesión—que erróneamente fué diagnosticada en 1945 como tuberculosa pero que desde sus comienzos era de naturaleza cancerosa—fué la primera manifestación de la enfermedad que luego se extendió a otras partes del cuerpo y culminó, luego de un lento progreso durante un número de años, en la muerte del Dr. Salazar. En su consecuencia no puede haber duda alguna de que el doctor murió de un cáncer producídole por las emanaciones de Rayos X a que estaba expuesta su mano izquierda diaria y continuamente durante un largo período de años.

La cuestión aquí, desde luego, es determinar si en este caso ocurrió una lesión *por accidente*. Este problema ha sido sustancialmente eliminado en un número de estados creándose una cubierta general para todas las enfermedades ocupacionales. La diferencia entre enfermedades causadas por lesiones por accidentes y enfermedades ocupacionales en dichos estados, se ha tornado inmaterial toda vez que en uno u otro caso siempre se concede compensación. Larson, 1 *Workmen's Compensation Law*, 580. Pero esta diferencia—que puede traer dificultades en un caso cerrado—subsiste en Puerto Rico. Y es necesario trazarla en este caso: si el cáncer

contraído por el Dr. Salazar en el curso y como consecuencia de su empleo, cae dentro de la categoría de una enfermedad ocupacional más bien que dentro de la de lesión por accidente, la reclamación debe denegarse, ya que el cáncer no está incluído en la tabla o lista de enfermedades ocupacionales que aparece en nuestra Ley.(²)

Nada tenemos que ver en este caso con dos cuestiones que han sido causa de considerable controversia en otras jurisdicciones. *Primeramente*, suponemos, a los fines de este caso y en el contexto de los hechos del mismo, que seguiríamos la regla de que una lesión por accidente puede ocurrir (*a*) sin que suceda algún evento externo y (*b*) si el esfuerzo o las circunstancias son usuales o extraordinarias. *Gray's Hatchery & Poultry Farms* v. *Stevens*, 81 A.2d 322 (Del., 1950); *Derby* v. *Swift & Co.*, 49 S.E.2d 417 (Va., 1948); *Southern Stevedoring Co.* v. *Henderson*, 175 F.2d 863 (C.A. 5, 1949); *Bollinger* v. *Wagaraw Bldg. Supply Co.*, 6 A.2d 396 (N.J., 1939); casos citados en *Kelly–Springfield Tire Co.* v. *Daniels*, 85 A.2d 795, 797 (Md. 1952); *Neylon* v. *Ford Motor Co.*, 91 A.2d 569, 570 (N.J., 1952) según se compara con el mismo caso en 86 A.2d 577 (N.J., 1952); 53 Col.L.Rev. 130, y casos citados; Larson, supra, pág. 516 *et seq.*; 27 N.C. L.Rev. 599; Horovitzs, Workmen's Compensation 88; 5 Schneider, Workmen's Compensation Text sec. 1446; 11 N.A.C.C.A. L.J. 76–7. Pero *cf. Cordero* v. *Comisión Industrial*, 68 D.P.R. 127.(³) *En segundo lugar*, la relación causal, v.g., la relación entre la enfermedad y el empleo, es de ordinario muy difícil de establecer por testimonio digno de crédito en esta clase de casos. *Valente* v. *Bourne Mills*, 75 A.2d 191 (R.I., 1950); N.A.C.C.A. L.J.

---

(²) "La lista de enfermedades es exclusiva, y no cae dentro de las facultades de los tribunales adicionarle otras nuevas, no importa que la enfermedad omitida sea obviamente ocupacional." Larson, supra, pág. 604; *Henry* v. *A. C. Lawrence Leather Co.*, 57 S.E.2d 760 (N. C., 1950).

(³) Como cuestión de hecho, aun cuando se requiriese un evento externo, el impacto de las emanaciones de Rayos X sobre la mano del Dr. Salazar durante un período de años probablemente cumple con dicho requisito.

41–6; Larson, supra, pág. 567. En la reclamación ante nos no existe tal problema. Todas las partes admiten que el cáncer del cual falleció el Dr. Salazar surgió en el curso y como consecuencia de su empleo.

Si bien no necesitamos evento externo o extraordinario en este caso y si bien el cáncer fué claramente causado por las condiciones del empleo, queda la cuestión de si ocurrió una lesión por accidente. Al tratar de resolver este problema, muchos tribunales, aparentemente la mayoría, han desarrollado dos fórmulas, que aceptamos: (1) la lesión debe haber sido ocasionada por un suceso no previsto o por un acontecimiento que no se esperaba ni se tenía en mente. *Fenton* v. *Thorley & Co., Ltd.*, A.C. 443 (1903) ; *Bollinger* v. *Wagaraw Bldg. Supply Co.*, supra; *Southern Stevedoring Co.* v. *Henderson*, supra; Larson, supra, pág. 512; (2) el origen de la lesión debe poder atribuirse dentro de límites razonables a una fecha, lugar y ocasión definidos. *Gray's Hatchery & Poultry Farms* v. *Stevens*, supra; Anotaciones, 90 A.L.R. 619; 23 A.L.R. 335; 6 A.L.R. 1466; 97 A.L.R. 1412; 29 A.L.R. 691; 44 A.L.R. 371; Larson, supra, pág. 513; 25 Harv.L.Rev. 328, 338 *et seq.* (⁴)

Convenimos que los anteriores dos requisitos de un accidente—lo inesperado del mismo y su ocurrencia en una época definida—pueden manifestarse bien en la causa de la lesión o en el resultado de la misma. *Purity Biscuit Co.* v. *Industrial Commission*, 201 P.2d 961 (Utah, 1949) ; 9 N.A.C.C.A. L.J. 43–5, y casos allí citados; 5 id., 67–8; 3 id., 96–102;

---

(¹) Debemos aclarar que los requisitos de lo inesperado y de ocasión definida no quieren necesariamente decir que la única manera en que puede ocurrir una lesión por accidente es mediante algún incidente o evento solitario. *Cf. Atiles* v. *Com. Industrial*, 69 D.P.R. 630, 634. Reconocemos que esta aclaración a su vez crea un problema: Una vez que admitimos que el accidente puede consistir de más de un evento y que puede ocurrir a través de un período de tiempo, el problema de la ocasión definida pasa a ser una cuestión de grado y la línea entre un caso compensable y uno no compensable puede ser difícil de determinar en un caso específico. Pero debemos trazar la línea como mejor podamos a la luz de la intención de la Asamblea Legislativa y los hechos de cada caso.

27 N.C. L.Rev. 599.([5]) Con esto vemos que, *primero*, una lesión por accidente ocurre si la causa es gradual e imperceptible, como en la exposición a polvo o a veneno, siempre que el resultado sea completamente definitivo en cuanto a la época: un colapso súbito en determinado momento. Larson, supra, pág. 578, casos citados en los escolios 19 a 23.([6]) *Segundo*, una lesión por accidente también ocurre en el caso contrario cuando la causa es abrupta, como en una exposición relativa- ' mente breve a frío intenso, aun cuando el resultado se prolongue—por ejemplo, sucumbir gradualmente debido a pulmonía. Larson, supra, pág. 577–8; *cf.* casos citados en el escolio 18. *Tercero*, cuando ni la causa ni el resultado son súbitos en modo alguno, no puede concederse una reclamación a base de lesión por accidente. Larson, supra, pág. 578.([7])

Es difícil determinar el peso de las autoridades en los casos que caen en la anterior tercera categoría. Reconocemos que algunos tribunales han llegado a la conclusión de que ocurrió una lesión por accidente al denegar la validez del requisito sobre ocasión definida. Otros han sostenido estas reclamaciones mediante "el uso de la teoría de la repetición del impacto, bajo la cual cada golpecito, rasguño, estremeci-

---

([5]) Como hemos indicado, el accidente no tiene que ser instantáneo y no se limita a un solo incidente o evento. Véase el escolio 4. Pero bien el incidente que lo precipita o bien la manifestación de la propia incapacidad, debe ser de carácter súbito o razonablemente corto.

([6]) En los casos citados en los escolios 19 a 23, se concedieron reclamaciones en las siguientes situaciones: "Semanas de trabajo excesivo y de esfuerzo extraordinario pueden producir una trombosis coronaria; muchos días de trabajo bajo el peso del calor pueden paulatinamente producir insolación; soportar durante doce horas el resplandor del sol puede finalmente ocasionar ceguera de nieve; sacudidas repetidas o esfuerzos extraordinarios pueden finalmente resultar en hernia de un disco intervertebral; o trabajar en cluclillas forzadamente durante largo tiempo puede culminar en 'rodillas anquilosadas'." Larson, supra, pág. 578.

([7]) Larson, supra, sintetiza el efecto de aplicar las fórmulas de lo inesperado y de la ocasión definida, en lo que concierne bien a la causa o bien al resultado, con el fin de determinar si ocurrió una lesión por accidente, a las págs. 514 a 515, como sigue:

"Las partes potenciales que constituyen el concepto de accidente, bajo el lenguaje estatutario ordinario, pueden en consecuencia dividirse así:

miento, ruido, o impacto de un poco de polvo de pedernal en los pulmones, es considerado. como un suceso accidental." Larson, supra, pág. 579, y casos citados; id., pág. 569, y casos citados en el escolio 16, págs. 569 a 573. Pero ". . . la mayor parte de las mismas jurisdicciones [que han resuelto que existe lesión invocando la teoría de la repetición del impacto] en alguna ocasión han denegado compensación por lesiones en esta categoría *por el fundamento de que la ocasión de la lesión no fué suficientemente definida.*" Larson, supra, págs. 573–4 (corchetes y bastardillas nuestros) ; véanse casos citados en el escolio 17, págs. 574–6. A nuestros fines, es importante indicar que la mayor parte· de los casos en que se denegó la reclamación ". . . cae en la categoría de lesiones cuya causa tanto como el resultado era difícil de localizar en cuanto a la ocasión en que ocurrieron." Larson, supra, pág. 577.

 Conviene repetir que no estamos resolviendo, que accidente bajo nuestros estatutos no quiere decir que la lesión deba haberse atribuído a un suceso único. Véase el escolio 4. Pero no podemos adherirnos a la teoría de la repetición del impacto *según ésta se aplica a casos en que tanto la causa como el resultado de la lesión fueron graduales y prolongados*

---

"I. *Lo inesperado*
　　"A. De causa
　　"B. De resultado
"II. *Ocasión definida*
　　"A. De causa
　　"B. De resultado
"Si se cumple con ambas partes de ambos elementos, surge el más vivo ejemplo de un accidente típico industrial, en el sentido común y corriente: choques, explosiones, resbalones, caídas, etc., que resultan en obvias lesiones traumáticas.

"*Al extremo opuesto, si todos los elementos están ausentes, surge la enfermedad ocupacional típica. La causa son las condiciones perjudiciales características de una industria determinada. El resultado es una clase de incapacidad que es de esperarse si se continúa el trabajo bajo estas condiciones durante mucho tiempo. Y el desarrollo de la enfermedad es de ordinario gradual e imperceptible durante un largo período.*

"Entre los dos extremos se encuentran las combinaciones que son objeto de las secciones siguientes, y que han producido y continúan produciendo un tremendo volumen de pleitos en todas las jurisdicciones cuyos estatutos requieren prueba de un accidente." (Segundas bastardillas nuestras.)

*como en el caso de autos durante un largo período de años.*
Aplicar dicha teoría a tales casos equivaldría a eliminar por
fíat judicial la distinción que nuestra Asamblea Legislativa
introdujo en nuestro estatuto entre lesión por accidente y
enfermedades ocupacionales.

Lo inesperado y la ocasión definida son precisamente las
fórmulas utilizadas para distinguir entre una lesión por ac-
cidente y una enfermedad ocupacional. Larson, supra, luego
de analizar innumerables casos, expone a la pág. 600 los prin-
cipios que deben seguirse y observarse en la solución de este
problema: ". . . Como han demostrado las secciones que pre-
ceden, los dos puntos decisivos de distinción entre accidente y
enfermedad ocupacional fueron el elemento de lo inesperado y
la cuestión de la ocasión definida. Lo que mantuvo las en-
fermedades ocupacionales fuera de las lesiones por accidente
fué tanto el hecho de que honradamente no podía decirse que
las mismas eran inesperadas, toda vez que se reconocían como
un peligro inherente de exposición continua a las condiciones
del empleo específico, como el hecho de que se producían gra-
dual más bien que súbitamente. De ahí que lo que de ordi-
nario podría ser una enfermedad ocupacional, podría conver-
tirse en un accidente, debido a una dosis extraordinaria y
súbita de la misma clase de polvo o gases que, absorbidos gra-
dualmente durante un largo período, producirían enfermeda-
des industriales típicas. De nuevo, una enfermedad ocupa-
cional podría transformarse en un accidente por la presencia
de un pequeño e inesperado incidente o por rotura o anorma-
lidad, como por ejemplo, contraer ántrax a través de un
rasguño, o absorber gases perjudiciales debido a un defecto
accidental en una máscara protectora . . ." Véase también
el escolio 7 de esta opinión.

La beneficiaria sostiene que toda vez que un accidente no
se limita a un solo evento, aquí ocurrió una lesión por acci-
dente en virtud de las emanaciones de Rayos X diarias y
continuas, que eran traumas repetidos y sucesivos en la mano

izquierda del Dr. Salazar. No estamos de acuerdo. Creemos que los hechos que la Comisión halló probados y sobre los cuales no hay controversia en este caso, demuestran que la lesión aquí no se ciñe a las fórmulas de lo inesperado y de la ocasión definida. La misma "honradamente no podía decirse que . . . era inesperada, toda vez que se reconocían como un peligro inherente de exposición continua a las condiciones de [su] empleo específico . . .". Y una enfermedad que tomó desde el 1924 hasta 1945 para presentar la primera manifestación—la lesión que apareció en 1945—y finalmente resultó en muerte en 1950 no ocurrió súbitamente o dentro de un período de tiempo razonablemente corto; obviamente, la misma "se producía gradual más bien que súbitamente." Nos parece por tanto inevitable resolver que éste es un caso de enfermedad ocupacional más bien que de lesión por accidente bajo nuestra·Ley.(⁸)

Casos como los de *Pittman* v. *Pillsbury Flour Mills*, 48 N.W.2d 735 (Minn., 1951); *Boyd* v. *Young*, 246 S.W.2d 10 (Tenn., 1951); *Southern Stevedoring Co.* v. *Henderson*, supra; *Valente* v. *Bourne Mills*, supra; *Purity Biscuit Co.* v.

---

(⁸) Como antes se ha indicado, existe una división de las autoridades en esta situación. Algunos casos soslayan el requisito de que el origen de una lesión por accidente deba atribuirse a una ocasión definida (1) tomando el cambio físico final como el evento que produjo la lesión o (2) caracterizando el deterioro gradual como una serie de traumas repetidos. Risenfeld, *Forty Years of American Workmen's Compensation*, 7 N.A.C.C.A. L.J. 15, 28, y casos citados. Con respecto a la parte .(1), nos damos cuenta del argumento de que el accidente ocurrió en la fecha de 1945 en que las murallas de la resistencia contra el cáncer fueron finalmente derrumbadas por el impacto de las emanaciones de los Rayos X, v.g., cuando las células precancerosas se convirtieron por primera vez en células cancerosas. Fuera del hecho de que no hubo testimonio médico o conclusiones de la Comisión sobre este extremo, tal conclusión pasa por alto el efecto de las emanaciones de Rayos X a través de los años. Si tenemos en cuenta que nuestro estatuto distingue entre lesión por accidente y una limitada lista de enfermedades ocupacionales compensables, debemos concluir que el cáncer fué ocasionado por los efectos de las emanaciones de Rayos X a través de los años, y no meramente por los impactos de un solo día en 1945. En cuanto a la parte (2), ya hemos indicado por qué no podemos seguir dicha teoría en este caso específico.

*Industrial Commission,* supra; *Bollinger* v. *Wagaraw Bldg. Supply Co.,* supra, son distinguibles porque la lesión por accidente en dichos casos puede atribuirse a un evento o eventos que ocurrieron súbitamente o dentro de un período de tiempo razonablemente corto. Pero *cf. Scobey* v. *Southern Lumber Co.,* 238 S.W.2d 640 (Ark., 1951). En el caso de *Bollinger* el tribunal resolvió que había ocurrido una lesión por accidente toda vez que un lunar que el empleado tenía en un pie se le irritó y convirtió en un cáncer en un solo día, a causa de la arena y las cenizas que inevitablemente se le introdujeron en los zapatos mientras hacía bloques de cenizas, arena y cemento. En el caso de *Bollinger* el tribunal en efecto describe la diferencia entre sus hechos y los del caso de autos a la pág. 399 como sigue: "Una enfermedad ocupacional es aquélla que por experiencia común ataca a personas que se dedican a determinada ocupación, en el curso ordinario de las cosas. Es una que es incidental al empleo propiamente dicho, v.g., los pintores sufren de cólicos o de envenenamiento con plomo; las telefonistas desarrollan enfermedades del oído; el envenenamiento con fósforo es común en aquéllos que trabajan en la fabricación de fuegos artificiales. Estos ejemplos podrían multiplicarse. En tales casos constituyen lesiones o enfermedades comunes a empleados en esas ramas específicas y, manifiestamente, no surgen de ordinario por accidente según se entiende comúnmente el término 'accidente'. Tales enfermedades no son compensables a no ser que por estatuto así se disponga." Sustancialmente al mismo efecto, *Stepnowski* v. *Specific Pharmaceuticals,* 87 A.2d 546 (N. J., 1952). Y, podemos añadir, los médicos que exponen sus manos a emanaciones de Rayos X durante un período de muchos años en el curso de sus empleos pueden, "en el curso ordinario de las cosas" e "incidental al empleo propiamente dicho", contraer la enfermedad del cáncer. Bajo tales circunstancias, la lesión es una enfermedad ocupacional, *no una lesión por accidente.*

Quizás la mejor manera de demostrar por qué el presente caso envuelve una enfermedad ocupacional es presentar un caso hipotético diferente. Si el Dr. Salazar, en el curso de aplicarle Rayos X a sus pacientes, se hubiera quemado la mano en una o en varias ocasiones razonablemente identificables y hubiera por ello contraído o se hubiera agravado un cáncer que ya tenía, el caso sería uno de lesión por accidente. Pero la manera y el tiempo en que se contrajo la enfermedad en este caso la convierten en una típica enfermedad ocupacional.

El dilema con que nos confrontamos en este caso ha sido expuesto suscintamente por Horovitz, supra, a la pág. 84: "Los patronos también sostuvieron que si bien la silicosis, el envenenamiento con benzol y varias *enfermedades industriales u ocupacionales* fueron el resultado de una serie de lesiones personales, aquéllas no eran compensables porque cada lesión personal no fué 'por accidente'. 'Por accidente' conlleva algo súbito, extraordinario, inesperado—un suceso no previsto o un acontecimiento que no se esperaba ni se tenía en mente, y las enfermedades industriales fueron de lento desarrollo, no extraordinarias, y de esperarse; y la gran mayoría de los estados que requieren un accidente se vió obligada a denegar compensaciones por ellas.

"Para corregir esta injusticia, muchos estados (1) han dejado de usar las palabras 'por accidente' o (2) han adicionado disposiciones específicas concediendo compensación por algunas o todas las enfermedades industriales. Desgraciadamente, algunos especifican estas enfermedades por sus nombres, y cuando aparece en medicina una enfermedad nueva, la pobre víctima nada recibe. Todo lo que la asamblea legislativa puede hacer en tales casos es hacerse cargo de futuras víctimas añadiendo la nueva enfermedad a la lista. Entretanto el tribunal carece de poder para ayudar a la víctima a menos que pueda calificarse la enfermedad como una lesión [en aquellos estados en que esto es suficiente], o como una

lesión por accidente." (Corchetes nuestros.) Según lo indica Horovitz, supra, a la pág. 78 "Generalmente se ha resuelto que las *enfermedades ocupacionales*, que son especialmente incidentales a empleos específicos, constituyen lesiones personales, pero de ordinario se deniega compensación por el fundamento de que las mismas no son causadas 'por accidente', ya que usualmente son el resultado de períodos prolongados de exposición." Hasta que nuestra Asamblea Legislativa elimine el requisito de accidente o amplíe la lista de enfermedades ocupacionales, los casos como el presente seguirán sin compensar.

La compensación por enfermedades causadas o agravadas por las condiciones del empleo es un objetivo digno de encomio. Pero la disposición para ello debe surgir de la asamblea legislativa y no de fíat judicial. La cuestión no se reduce a una interpretación liberal del estatuto o a una aplicación liberal de sus términos; todos convenimos en que tal liberalidad debe prevalecer en casos de compensaciones a obreros. Aquí el obstáculo invencible es que no existe base para la compensación bajo el requisito de lesión *por accidente* que se halla en nuestra Ley.

Como en el campo de los daños, con frecuencia es difícil aplicar precedentes a la compensación a obreros con motivo de la diferencia en los hechos de cada caso. *Atiles, Admor.* v. *Comisión Industrial*, 66 D.P.R. 791, y *Atiles* v. *Com. Industrial*, 69 D.P.R. 630, en los cuales descansa la beneficiaria, son quizás en sus hechos distinguibles del presente caso. En el primer caso de Atiles un empleado ya afectado de gripe trabajó durante un día repicando el empañetado de una pared, usando un cortafrío y un marrón que pesaba dos libras. Aspiró considerable polvo y estornudaba frecuentemente. El obrero se quejaba de un fuerte dolor de cabeza y sudaba copiosamente. Como hacía mucho sol en el sitio donde trabajaba, el maestro de obras lo cambió para que trabajara a la sombra. Nunca volvió al trabajo y falleció de pulmonía cinco

días después. Es innecesario que determinemos en el presente caso si aspirar polvo durante un solo día, y por ello agravarse la enfermedad del obrero y causarle su muerte cinco días después, cumpliría con los requisitos que hemos establecido en esta opinión. Quizás se podría alegar que ni la causa ni el resultado fueron graduales como en el presente caso; y por consiguiente que el concepto de accidente no fué necesariamente excluído en dicho caso.

En el segundo caso de Atiles el empleado trabajó durante ocho años, 5 ó 6 meses cada año, barnizando el interior de tanques para envejecer cerveza. Como resultado, el asma latente del empleado se manifestó activamente. La opinión de la mayoría indicó, 69 D.P.R. a la pág. 633, que "La prueba que tuvo ante su consideración la Comisión fué suficiente para demostrar que la enfermedad del obrero en este caso *se circunscribió a un determinado período corto de tiempo—dos o tres semanas antes de haber sido llevado al hospital*—y que la misma fué consecuencia directa del trauma repetido que recibió el obrero en sus bronquios, al trabajar bajo las condiciones desfavorables en que lo hacía con motivo de los gases y del humo que despedía el barniz derretido y que él aspiraba mientras trabajaba." (Bastardillas nuestras.) Quizás podría aquí argumentarse que si bien la causa fué muy prolongada —ocho años—para encajar en el concepto de accidente, el resultado—desarrollo de asma en dos o tres semanas—ocurrió dentro de un período de tiempo suficientemente corto y razonablemente definido, de suerte que quizás podría clasificarse como un accidente a tenor con los puntos de vista hasta aquí indicados. (9)

---

(9) La Comisión resolvió en el presente caso que el segundo caso de Atiles era distinguible porque envolvía un obrero que ya tenía el asma que se le agravó por las condiciones de su empleo. Al distinguir dicho caso la Comisión descansó en nuestro lenguaje en 69 D.P.R. a la pág. 639 que dice así: "Tanto los casos citados, como el de autos, caen en la categoría de aquéllos en que, existiendo una enfermedad previa, latente, el obrero debe tener derecho a compensación por todas las consecuencias atribuíbles a la lesión o lesiones que con motivo del accidente aceleró, revivió o agravó dicha enfermedad. En el presente, el obrero tenía el asma en estado latente y los

En vista de lo anterior, huelga decir en este caso si los dos casos de *Atiles* fueron correcta o erróneamente resueltos por sus hechos. Lo que sí queremos aclarar es que estamos dejando a un lado el raciocinio sobre el cual fueron resueltos. En dichas opiniones este Tribunal descansó en casos y empleó lenguaje tan amplio que la regla parecía ser "que todas las enfermedades atribuíbles al empleo, son compensables bajo la teoría de 'un accidente', a pesar de no estar incluídas en la lista de enfermedades ocupacionales establecidas por el poder legislativo." *Atiles* v. *Com. Industrial*, 69 D.P.R. 630, 641, opinión disidente. Ahora rechazamos esta tesis y en su lugar resolvemos que, a fin de probar que ocurrió una lesión por accidente, debe establecerse (1) que la lesión fué debida a un evento o eventos inesperados y (2) que el origen de la lesión puede atribuirse a límites razonables en una ocasión definida.(10) Aplicando estos dos requisitos a los hechos de este caso, resolvemos que aquí no ocurrió una lesión por accidente.

*La decisión de la Comisión Industrial será confirmada.*

El Juez Asociado Sr. Negrón Fernández disintió.

---

gases y el humo que forzosamente tenía que aspirar, le causaron el trauma repetido en sus bronquios, y en esto consiste el accidente, habiendo sido esta alergia a los gases y el humo lo que aceleró los ataques de asma, agravó su enfermedad y lo incapacitaron para el trabajo."

La Comisión interpretó erróneamente la decisión en el segundo caso de Atiles. Este Tribunal no tuvo por miras limitar la doctrina allí expuesta a casos en que se agrava una enfermedad ya existente. Una lectura de toda la opinión demuestra que la mayoría del Tribunal en dicho caso fué de opinión que había ocurrido un accidente compensable y que el obrero tenía derecho a recibir compensación, no importa si dicho accidente agravó una enfermedad existente o fué la causa original de una nueva enfermedad.

(10) En *Atiles, Admor.* v. *Comisión Industrial*, 66 D.P.R. 791, 795-6, este Tribunal descansó en una cita de Horovitz, supra, a las págs. 147-8, que dice así:

"Las enfermedades no surgen necesariamente del empleo. Pero cuando se demuestra una relación causal entre la enfermedad y el empleo, y hay evidencia de repetidos aunque pequeños traumas sobre el cuerpo o el daño corporal resulta de la exposición a la intemperie o de un esfuerzo, aun durante un período de meses más bien que en un momento específico, la enfermedad es compensable, bien como una enfermedad enteramente nueva o como una enfermedad preexistente que ha sido agravada. Así, la inhalación de polvo de arena es considerada como un trauma repetido sobre los pulmones, y si agrava una tuberculosis durmiente, o produce una silicosis,

estas enfermedades, estando casualmente relacionadas con el empleo surgen del mismo. La agravación de muchas enfermedades, tanto las de tipos usuales como las no usuales, es claramente compensable. Así, en muchos estados se han concedido compensaciones basadas en que un cáncer o tumor maligno (cuya causa es generalmente desconocida) ha sido agravado y su propagación acelerada. Aún la conclusión de causa original subsiste. Cuando la adjudicación de compensación se basa en testimonio médico de que existe una relación causal, el fallo será sostenido, no importa la opinión privada de la corte en cuanto al cáncer."

La opinión disidente en el caso de *Atiles* v. *Com. Industrial*, 69 D.P.R. 630, señala a la pág. 642, escolio 1, el error en que este Tribunal incurrió al descansar en la anterior cita de Horovitz. El lenguaje en cuestión trata solamente del problema de la relación causal entre la enfermedad y el trabajo del obrero. Aparece en una parte del libro donde Horovitz discute la necesidad de probar que la enfermedad o lesión surgió como consecuencia del empleo. Y de su faz este lenguaje trata de ese problema. Nada tiene que ver con el problema ante nos—si ocurrió o no un accidente. Como hemos visto, en el caso de autos no hay duda de que existe una relación

---

causal entre la enfermedad y las condiciones del empleo. Horovitz discute la cuestión primordial en este caso—lesión por accidente—no a las págs. 147–8, sino a las págs. 84 y 78, que acabamos de citar, y sostiene nuestro criterio en este caso.