La Sucesión de Manuel Enrique Fernández Tavárez, etc., recurrente, *v.* Comisión Industrial de Puerto Rico, etc., recurrida.

*Número:* CI-62-16 *Resuelto:* 27 de marzo de 1963

879

*A. Cadilla Ginorio,* abogado de la recurrente; *Donald R. Dexter* y *Carmen Ana Archeval,* abogados de la recurrida.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Los miembros de la sucesión de Manuel Enrique Fernández Tavárez recurren ante nos de la resolución de la Comisión Industrial de Puerto Rico de 14 de agosto de 1962 dictaminando que no hay relación causal entre la muerte del causante de la sucesión y el accidente que sufrió en su trabajo, y confirmando así la negativa de compensación del Administrador del Fondo del Seguro del Estado.

El referido causante, Manuel Enrique Fernández Tavárez, joven electricista de unos 19 años de edad, al segundo día de trabajar en una finca de la sucesión de Antonio Valdés en el sitio denominado Porrada del Barrio Islote de Arecibo, el 17 de febrero de 1961, mientras tiraba unos paquetes de caña hacia un camión donde los recibía su compañero el testigo Confesor Torres Natal, sufrió un accidente. Al abrirse en el aire uno de los paquetes durante la tarea de cargar el camión, la caña se le derramó encima a Fernández, le dio en el ojo izquierdo "más el serrín que tenía y el desperdicio que tenía la caña por encima le cayó en la vista a él." (T.E. págs. 13 y 14.) Declaró el administrador judicial de la sucesión dueña de la finca, Rafael Valdés, que ese mismo día Fernández fue donde él y "me alegó que al tirar el paquete de caña al truck le cayó basura en la cara y le cayó en un ojo. Yo siempre hago una investigación por mi cuenta. Tenía el ojo muy irritado; le lagrimeaba y *tenía una pequeña peladura dentro del párpado*. Bajo ese motivo tuve que reportarlo." (T.E. pág. 19.) (Énfasis suplido.) La madre del obrero declaró que éste regresó a su casa al mediodía en la fecha del accidente en cuestión "con el ojo demasiado de colorado; como que se había dado un golpe, porque estaba demasiado ensangrentado." (T.E. pág. 6.)

Se dirigió Fernández a la oficina del Fondo del Seguro del Estado en Arecibo, atendiéndolo allí el Dr. Zapata. El informe de este médico es al efecto de que lo examinó el día 20 del referido mes de febrero; que "la lesión o afección presente" es una ambliopía del ojo derecho, o sea, una debilidad o disminución de la vista, sin lesión orgánica del ojo; y, por último, que el obrero podía regresar a su trabajo al día siguiente. (Exhibit 3.) Éste regresó y trabajó dos o tres días más pero como seguía mal de la vista, se dirigió a la oficina del Fondo del Seguro en San Juan. El 24 de dicho mes de febrero apeló ante la Comisión Industrial de la decisión del Administrador del Fondo del Seguro del Estado del día 21 anterior negando que existía relación causal entre la

condición que presentaba en su ojo izquierdo y su alegado accidente del día 17 anterior. Ese día 24 Fernández fue examinado por el asesor médico de la Comisión quien lo refirió al oftalmólogo consultor, Dr. Montalvo Carroll. Éste, en 6 de marzo de 1961, rindió un informe manifestando que el obrero presentaba una separación de la retina inferior de su ojo izquierdo, condición que, a su juicio, guardaba relación con el traumatismo sufrido en 17 de febrero anterior. En ese mismo día 6 de marzo de 1961, el Dr. Guillermo Fernández, oculista del Fondo del Seguro del Estado examinó al obrero y recomendó que se investigase el caso de nuevo, pues, a base de una descripción completamente distinta del accidente, "el Dr. Zapata estuvo justificado en su informe de no relación." El Dr. Guillermo Fernández lo examinó y encontró que en el ojo izquierdo tenía un desprendimiento de la retina; que para desprenderse una retina tiene que estar enferma, pero un "trauma" puede ser un factor que precipite el desprendimiento. Se retuvo al obrero bajo tratamiento en el Instituto Oftalmológico hasta el 15 de marzo. Luego, a su solicitud, se le dio un pase hasta el 20 de dicho mes; después fue operado. Añadió este doctor que el examen del 6 de marzo no demostraba exteriormente nada en absoluto; ninguna raspadura, ni cortadura, ni lesión externa. (T.E. págs. 25 y 36.) El obrero murió el 26 de marzo determinándose que la causa fue la enfermedad de Weil.

De acuerdo con el testimonio del perito, Dr. Jackie Cocker, esta enfermedad se contrae por contagio o por contacto directo, cuando la persona ingiere alimentos contaminados, o por contacto indirecto, cuando la persona viene en contacto "con animales que están de por sí contaminados o cuya orina contiene el agente causal." Cualquier abrasión de piel o contusión puede servir de puerta de entrada. (T.E. págs. 31, 33 y 34.) La evidencia demostró que en los cañaverales y particularmente en el lugar del accidente, abundan los ratones (T.E. págs. 15 y 16).

La Comisión ordenó el archivo del caso en 7 de abril de 1961, pero solicitada la reconsideración de dicha orden en 9 de mayo, se concedió al Administrador del Fondo del Seguro un término de 10 días para alegar. Luego de practicada la autopsia del cadáver en 22 de noviembre de 1961, el Administrador resolvió que se trataba de un caso no protegido por la vigente Ley de Compensaciones por Accidentes del Trabajo ya que el caso se diagnosticó en 17 de febrero de ese año como uno de ambliopía y el obrero murió en "20 de abril" siguiente, de la enfermedad de Weil. No conforme con esta determinación apelaron los recurrentes ante la Comisión Industrial y ésta, luego de la vista del caso celebrada en 21 de mayo de 1962, emitió su resolución de 14 de agosto del mismo año confirmando el dictamen del Administrador. En dicha resolución, sin embargo, la Comisión declaró que los siguientes hechos quedaron probados:

1) El accidente ocurrídole al obrero en 17 de febrero de 1961 le ocasionó la separación de la retina inferior de su ojo izquierdo;

2) Que llegó a su casa con el ojo izquierdo demasiado colorado y ensangrentado; le lagrimeaba y tenía una pequeña peladura dentro del párpado;

3) Que cualquier abrasión, raspadura o contusión en la piel puede servir de puerta de entrada a la enfermedad de Weil que es una enfermedad ocupacional siendo propensas a esta enfermedad las personas que viven en sitios rodeados de caña, donde no hay servicio sanitario;

4) Que de los récords clínicos no aparece que el obrero hubiese tenido cortadura o rasguño en el ojo izquierdo.

Resolvió la Comisión que el desprendimiento de la retina en este caso tiene relación con el accidente en cuestión, pero que la enfermedad de Weil no estaba relacionada con el accidente. Alegan los recurrentes que la Comisión Industrial cometió error al concluir que el obrero no contrajo la enfermedad de Weil con motivo del accidente que sufrió en 17 de

febrero de 1961 y que su resolución es contraria a la prueba y a derecho.

 Repetidamente hemos resuelto que dentro de la interpretación liberal que debe dársele a la Ley de Compensaciones por Accidentes del Trabajo, cualquier duda debe resolverse a favor de la compensación. También hemos dicho que cuando las conclusiones de hecho en que se basa la resolución de la Comisión están sostenidas por prueba sustancial presentada en la vista correspondiente, debemos aceptarlas a los efectos de disponer del caso. *Gallart, Admor.* v. *Comisión Industrial,* 87 D.P.R. 17 (1962); *Vda. de Meléndez* v. *Comisión Industrial,* 85 D.P.R. 58 (1962); *Candelaria* v. *Comisión Industrial,* 85 D.P.R. 20 (1962); *Cepeda* v. *Comisión Industrial,* 76 D.P.R. 801 (1954); *Colón* v. *Comisión Industrial,* 59 D.P.R. 850 (1942).

El caso de *Vda. de Salazar* v. *Admor. del Fondo del Estado,* 76 D.P.R. 108 (1954),[1] trataba de un médico que por exposición de muchos años a los Rayos X, contrajo un cáncer epidermoide que le produjo la muerte. Al resolver que en este caso no ocurrió una lesión por accidente y, por lo tanto, el caso no era compensable establecimos la siguiente doctrina:

 "A fin de probar que ocurrió una lesión por accidente, debe establecerse (1) que la lesión fue debida a un evento o eventos inesperados, y (2) que el origen de la lesión puede atribuirse a límites razonables en una ocasión definida."

En *Vélez* v. *Comisión Industrial,* 79 D.P.R. 282 (1956), resolvimos que la enfermedad de Weil que produjo la muerte del obrero no fue ocasionada por ningún accidente que pu-

[1] En este caso también dijimos (cita precisa a la página 114) que:
". . . *primero,* una lesión por accidente ocurre si la causa es gradual e imperceptible, como en la exposición a polvo o a veneno, siempre que el resultado sea completamente definitivo en cuanto a la época: un colapso súbito en determinado momento. . . . *Segundo,* una lesión por accidente también ocurre en el caso contrario cuando la causa es abrupta, como en una exposición relativamente breve a frío intenso, aun cuando el resultado se prolongue—por ejemplo, sucumbir gradualmente debido a pulmonía. . . . *Tercero,* cuando ni la causa ni el resultado son súbitos en modo alguno, no puede concederse una reclamación a base de lesión por accidente."

diera dar lugar a compensación; que dicha enfermedad era uno de los riesgos inherentes y normales de la labor que desempeñaba el obrero fallecido; 'en otras palabras, una *'enfermedad ocupacional'* en todo el rigor del concepto", que no es compensable pues el legislador no la incluyó en la Tabla de Enfermedades Ocupacionales y sus Causas que aparece en el Art. 3 de la Ley (11 L.P.R.A. sec. 3). De acuerdo con los hechos de este caso, el trabajo del obrero consistía en limpiar canales de riego para las plantaciones de caña. Un día sus compañeros de faena encontraron que tenía fiebre alta y lo llevaron inmediatamente al hospital de Guayama donde murió como consecuencia de la enfermedad de Weil. Se estipuló en este caso que el obrero ". . . *no sufrió golpe ni caída ni accidente alguno en el trabajo.*" (Énfasis nuestro.) Específicamente, citando con aprobación la doctrina que establecimos en *Salazar,* supra, dijimos:

"Ante todo conviene consignar que no basta una suposición o conjetura para establecer la relación causal entre la enfermedad infecciosa y el empleo. El hecho esencial de que la enfermedad surgió en el curso y como consecuencia del trabajo tiene que probarlo el reclamante en forma competente y digna de crédito. Obviamente esta relación es muy difícil de probar cuando se trata de enfermedades infecciosas. Véase 1 Larson's *Workmen's Compensation Law,* sec. 40.60. Pero esto no puede alterar la carga de la prueba ni eliminar la necesidad de establecer dicha relación causal como condición previa a toda compensación. En el caso de autos no hubo prueba pericial positiva de que la infección se contrajo en el curso y como consecuencia del trabajo. La Comisión se apoya para llegar a su conclusión sobre la relación causal en un 'balance de probabilidades' y admite que no hubo 'prueba directa en cuanto a si la infección fue contraída el mismo día y en el sitio en que trabajaba el obrero.'

". . . . . .

"Cuando se trata de enfermedades infecciosas, creemos que no puede existir un 'accidente' si los microbios o parásitos penetran en el organismo humano a través del sistema respiratorio o del gastrointestinal, o por cualquier otra vía normal y natural, sin que pueda atribuirse la infección a un traumatismo o

lesión de los tejidos por agentes mecánicos que en sí constituya algo inesperado, súbito y fortuito y que permita fijar dentro de límites razonables la fecha, lugar y ocasión en que se originó la enfermedad.

"......

"Nada en la prueba que tuvo ante sí la Comisión en el caso de autos demuestra que el obrero fallecido contrajo la enfermedad de Weil por razón de un traumatismo que en sí fue algo inesperado, súbito y fortuito. Tampoco puede fijarse en forma alguna la fecha, lugar y ocasión en que se originó la enfermedad. Dicho en otras palabras, aquí la ictericia infecciosa no se contrajo como resultado de un evento inesperado, súbito o fortuito que causó violencia en el cuerpo del obrero fallecido. La mera posibilidad o conjetura de que el obrero pudo haber adquirido la enfermedad de Weil a través de una pequeña cortadura en sus manos o tomando agua contaminada en el trabajo, no es suficiente para que pueda calificarse lo sucedido como un 'accidente'. La ictericia infecciosa en verdad constituye una enfermedad ocupacional típica de las personas que trabajan en labores de limpieza de canales y alcantarillas y también en los cortadores de caña en áreas que se inundan."

■ Un análisis de los hechos probados en este caso, de acuerdo con la resolución de la propia Comisión, nos obliga a concluir que contrario a la situación en *Vélez*, supra, aquí se estableció "en forma competente y digna de crédito" que el occiso contrajo la enfermedad de Weil por razón del traumatismo que sufrió en el accidente de 17 de febrero de 1961 "que en sí fue algo inesperado, súbito y fortuito."

En sus determinaciones de hecho, la Comisión concluye que (1) el causante de los recurrentes sufrió con motivo del accidente una peladura dentro del párpado en el ojo izquierdo y que (2) de los récords clínicos no aparece que el obrero hubiese tenido cortadura o rasguño en el ojo izquierdo. Esta contradicción tiene su explicación en el hecho de que del conjunto de la prueba es evidente que el primer examen practicado al occiso en el que descansa la determinación de que no hubo cortadura está equivocado, pues sólo informa una ambliopía del ojo derecho cuando los récords clínicos subsiguien-

tes claramente demuestran que el occiso sufrió un desprendimiento de la retina del ojo izquierdo, que según el Dr. Montalvo Carroll, guarda relación con el traumatismo que sufrió el occiso en 17 de febrero. El Dr. Guillermo Fernández declaró que en 6 de marzo el examen oftalmológico no demostraba ninguna raspadura o cortadura ni lesión externa del ojo en cuestión. No consideramos esta declaración concluyente con respecto a que el obrero no hubiese sufrido raspadura alguna, pues este examen se realizó 16 días después de ocurrido el accidente, y por el contrario, hubo prueba directa de la lesión, y así lo determinó la Comisión.

■ Tenemos, pues, que el obrero trabajaba en un lugar donde prevalecen las condiciones propicias para contraer la enfermedad de Weil, que ocurrió un accidente y con motivo del mismo sufrió un traumatismo en forma de una raspadura del párpado del ojo izquierdo y que desarrolló la enfermedad de Weil dentro del período de incubación de esa enfermedad (que varía entre dos días hasta dos semanas en unos casos y un período mayor en otros) (T.E., pág. 35) después del accidente; y, por último, que dentro del período desde la fecha del accidente hasta que murió el obrero no estuvo en ningún otro sitio donde pudo haber contraido dicha enfermedad, ni se demostró que hubiese estado en tal sitio antes del accidente. Cabe preguntar ahora si de estos hechos podemos concluir que los recurrentes han probado "en forma competente y digna de crédito" que la enfermedad de Weil en este caso "surgió en el curso y como consecuencia del trabajo." Contrario a *Vélez*, supra, en donde no se probó la existencia de un accidente y por el contrario se admitió que el obrero no sufrió golpe o caída y sólo se conjeturó por la Comisión que el obrero pudo haber contraido la enfermedad de Weil a través de una pequeña cortadura en sus manos o tomando agua contaminada, en el caso ante nos se ha comprobado y aceptado por la Comisión que de hecho ocurrió el accidente y que con motivo del mismo el obrero sufrió una raspadura en un párpado. Al igual que en *Vélez*, supra, se demostró

que las circunstancias del lugar donde trabajaba el obrero son propicias para la existencia de la enfermedad de Weil, pues en los cañaverales abundan las ratas que son los más importantes trasmisores de esa enfermedad. La doctrina que establecimos en *Vélez*, supra, no llega al extremo de exigir que los recurrentes prueben que no tan sólo su causante sufrió un traumatismo con motivo de un accidente, sino que el parásito de la enfermedad de Weil específicamente penetró en su cuerpo por dicha lesión comprobándose este hecho con prueba pericial. A los fines de cumplir con los requisitos de la doctrina que establecimos en *Vélez* y en *Salazar*, supra, es suficiente comprobar, como se ha hecho en este caso, que ocurrió el accidente en el cual el obrero sufrió una lesión, que el lugar del accidente era propicio para contraer dicha enfermedad, que ésta se contrajo dentro de un período subsiguiente al accidente que no excede del período corriente de incubación de dicha enfermedad y que no se comprobó el haberla contraido en otra forma.

*Debe revocarse la resolución recurrida y devolverse el caso a la Comisión Industrial de Puerto Rico para que ordene al Fondo del Seguro del Estado que liquide y pague la compensación que corresponda.*